NUMBER 13-06-130-CV



COURT OF APPEALS
 

 

THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CATHRYN LISA GARNETT, Appellant,


v.


GIOVANNA GHAFOORI, M.D. AND

MUHAMMAD MOTIWALA, M.D., Appellees.

 


On appeal from the 138th District Court


of Cameron County, Texas.

 

 

MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza
 

 This is a medical malpractice claim in which appellant, Cathryn Lisa Garnett,
appeals the trial court's granting of (1) two no-evidence motions for summary judgment,
(2) a dismissal with prejudice of all of her claims against appellee, Muhammad Motiwala,
M.D., and (3) a qualifications challenge to her expert witness by appellee, Giovanna
Ghafoori, M.D. (1) By four issues, Garnett contends that: (1) the trial court erred in granting
Ghafoori's no-evidence motion for summary judgment because fact issues remain as to
whether her expert witness, John R. Graybill, M.D, was qualified to offer expert testimony
on the appropriate standard of care, whether Ghafoori breached that standard of care, and
whether Ghafoori's alleged breach of the standard of care was the proximate cause of her
injuries; (2) the trial court erred in granting Ghafoori's objections to the qualifications of
Graybill pursuant to section 74.401 of the Texas Civil Practice and Remedies Code
because this case is governed by former article 4590i and the trial court failed to conduct
a hearing on Ghafoori's qualifications challenge, as required by former article 4590i; (3) the
trial court erred in granting Motiwala's no-evidence motion for summary judgment because
fact issues remain as to whether Motiwala breached the appropriate standard of care and
whether the breach was a proximate cause of her injuries; and (4) the trial court erred in
granting Motiwala's motion to dismiss with prejudice because Graybill's expert report is
adequate under former article 4590i, section 13.01(r)(6) of the Texas Revised Civil Statutes
(current version at Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon Supp. 2006)) (2),
and, alternatively, because there is also a claim alleging improper use of packaging inserts,
no expert report is required. We affirm the judgment of the trial court. 

I. Factual and Procedural Background

 In 1996, Garnett underwent surgery for cosmetic breast augmentation with implant
placement. Upon learning about her family's history of breast cancer, Garnett elected to
undergo a prophylactic bilateral total mastectomy to reduce her risk of breast cancer in
1999. (3) Garnett then contacted Ghafoori, a plastic surgeon, to perform breast
reconstruction surgery to re-insert breast implants for aesthetic purposes. Ghafoori
conducted the breast reconstruction surgery in multiple surgical procedures that occurred
on March 18, 1999, November 19, 1999, July 7, 2000, and October 3, 2000.

 However, in August 2002, Garnett notified Ghafoori that she was experiencing
tenderness in her right breast and that her right breast appeared smaller than her left
breast. (4) On September 6, 2002, Garnett underwent a second breast reconstruction
surgery. Garnett was to have both of the breast implants removed and replaced. In this
surgery, Ghafoori discovered that the "right implant was found to be fine with normal fluid
collection and scar tissue present." Ghafoori further discovered that the left "implant was
fine, with a larger amount of fluid build up around this implant than on the right side." 
Garnett alleges that, at this time, Ghafoori discovered an infection in one implant, and
conducted an intraoperative telephone consultation with Motiwala, an infectious disease
physician, regarding the discovered infection. As a result of the alleged conversation with
Motiwala and the discovery of the infected implants, Garnett contends that Ghafoori
removed the implants, soaked them in Betadine, (5) and put the same infected implants back
into her body. Garnett further alleges that Ghafoori and Motiwala breached appropriate
standards of care for failing to remove and replace the infected breast implants with new
breast implants and for failing to recommend that the implants be removed and replaced,
respectively. (6) 

 Conversely, Ghafoori contends that she was unaware of an infection in Garnett's
breast implants at the time of surgery. Out of an abundance of caution, Ghafoori contends
that she removed the implants and sent cultures of the implants, tissue, and drained fluid
to the pathology department for testing prior to reinserting the implants. (7) On September
12, 2002, Ghafoori received the results from the tests conducted by the pathology
department: a positive culture for fungus Bipolaris. Under the care of several infectious
disease specialists, including Motiwala, Garnett was treated with the antifungal medication,
IV itraconazole. As a result of the positive culture for fungus Bipolaris and at the request
of the infectious disease specialists, Garnett underwent a third surgery to remove both the
right and left breast implants. 

 On August 29, 2003, Garnett filed suit against Valley Baptist Medical Center
("VBMC") and Valley Baptist Ambulatory Surgery Center, L.L.C. ("VBASC"). Ghafoori was
joined as a defendant by Garnett's first amended petition on February 26, 2004, and
Motiwala was joined by Garnett's second amended petition on October 19, 2004. (8)

 On November 12, 2004, Ghafoori filed a no-evidence summary judgment motion
alleging that Garnett had failed to designate a qualified medical doctor to opine on the care
and treatment rendered by Ghafoori and as to whether the alleged negligence proximately
caused Garnett's claimed damages. 

 On April 26, 2005, Motiwala filed a motion to dismiss with prejudice with the trial
court. On May 17, 2005, in response to Motiwala's motion to dismiss, Garnett filed an
expert report from Graybill that was written on letterhead from The University of Texas
Health Science Center at San Antonio and dated February 25, 2004. The expert report
was accompanied by Graybill's extensive curriculum vitae. Additionally, Garnett
designated Graybill as plaintiff's testifying expert witness.

 On July 22, 2005, Garnett filed a supplemental report from Graybill. The
supplemental report was an electronic mail dated July 15, 2005, sent by Graybill. Later,
on August 2, 2005, Motiwala filed a no-evidence motion for summary judgment alleging
that Garnett has failed to produce legally sufficient evidence establishing that Motiwala was
negligent and that such negligence caused Garnett's injuries and damages. 

 On November 2, 2005, Ghafoori filed an objection to the qualifications of Graybill
pursuant to section 74.101 of the Texas Civil Practice and Remedies Code. See Tex. Civ.
Prac. & Rem. Code Ann. § 74.101 (Vernon 2005). On November 23, 2005, Ghafoori filed
a second no-evidence motion for summary judgment alleging that Garnett had not
presented any evidence of both a standard of care violation against Ghafoori and a breach
of a standard of care that proximately caused the damages sustained by Garnett. In
support of this motion, Ghafoori attached deposition testimony from Graybill, Motiwala, and
herself. 

 On December 15, 2005, the trial court conducted a hearing on all pending motions
from all parties. On February 15, 2006, the trial court granted the following motions: (1)
Ghafoori's objection to the qualifications of Graybill pursuant to section 74.401 of the Texas
Civil Practice and Remedies Code; (2) Motiwala's motion to dismiss with prejudice; (3)
Ghafoori's no-evidence motion for summary judgment; (9) and (4) Motiwala's no-evidence
motion for summary judgment pursuant to former article 4590i, section 13.01(e). (10) See
Tex. Civ. Prac. & Rem. Code Ann. § 74.401; former Tex. Rev. Civ. Stat. Ann., art. 4590i,
§ 13.01(e) (repealed 2003). 

 Garnett filed her first notice of appeal on March 13, 2006. (11) The trial court granted
Garnett's request for appeal on March 20, 2006. On April 26, 2006, Garnett filed a request 
with the trial court for findings of fact and conclusions of law. Ghafoori and Motiwala both
contested Garnett's request. Subsequently, the trial court denied Garnett's request for
findings of fact and conclusions of law on May 10, 2006. This appeal ensued. (12) 


II. Standard of Review


 The standards for reviewing a motion for summary judgment are well established. 
See Tex. R. Civ. P. 166a(i); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex.
1985). In an appeal of a no-evidence motion for summary judgment, this Court considers
all evidence in the light most favorable to the nonmovant and disregards all evidence and
inferences to the contrary. See Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506
(Tex. 2002); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); see
also Los Cucos Mexican Cafe, Inc. v. Sanchez, No. 13-05-578-CV, 2007 Tex. App. LEXIS
3408, at *3 (Tex. App.-Corpus Christi May 3, 2007, no pet.). 

 A no-evidence summary judgment is essentially a pre-trial directed verdict, and we
apply the same legal sufficiency standard in reviewing a no-evidence motion for summary
judgment as we apply in reviewing a directed verdict. Mack Trucks v. Tamez, 206 S.W.3d
572, 581-82 (Tex. 2006); King Ranch v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003). 
A no-evidence motion for summary judgment must be granted if (1) the movant asserts
that there is no evidence of one or more specified elements of a claim or defense on which
the respondent would have the burden to prove at trial, and (2) the respondent produces
no evidence raising a genuine issue of material fact on such elements. ABB Kraftwerke
Aktiengesellschaft v. Brownsville Barge & Crane, Inc., 115 S.W.3d 287, 290-91 (Tex.
App.-Corpus Christi 2003, pet. denied); see Tex. R. Civ. P. 166a(i). 

 In raising a genuine issue of material fact, the nonmovant must set forth more than
a scintilla of probative evidence as to the essential elements of the nonmovant's claims in
which the nonmovant would have the burden to prove at trial. See Havner, 953 S.W.2d
at 711. If the evidence supporting a finding rises to a level that would enable reasonable,
fair-minded persons to differ in their conclusions, then more than a scintilla of evidence
exists. Id. Less than a scintilla exists when the evidence is "so weak as to do no more
than create a mere surmise or suspicion" of fact, and the legal effect is that there is no
evidence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).

 When a trial court's order granting summary judgment does not specify the ground
or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of
the theories advanced are meritorious. See Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001); see also H.B. Turbo, L.P. v. Turbonetics Eng'g & Servs., No. 13-06-083-CV, 2007 Tex. App. LEXIS 4425, at **5-6 (Tex. App.-Corpus Christi June 7, 2007, pet.
filed) (mem. op.) (noting that "because the trial court's order does not specify the ground(s)
on which the summary judgment was granted, and because there are multiple grounds on
which summary judgment may have been granted, HB [appellant] is required to negate all
grounds on appeal").

III. Analysis


 As a preliminary matter, because Garnett has failed to perfect her appeal as to
Ghafoori's qualifications challenge and Motiwala's motion to dismiss, we overrule her
second and fourth issues. See Parrish v. Rutherford, 159 S.W.3d 114, 117 (Tex.
App.-Corpus Christi 2004, no pet.) ("Further, appellant's notice of appeal failed to specify
they were appealing the October 3, 2001 order . . . .") (citing Tex. R. App. P. 25.1; 33.1). 
Additionally, we would not reach these issues in light of our disposition. See Tex. R. App.
P. 47.1. We will now analyze the no-evidence motions for summary judgment filed by
Ghafoori and Motiwala.


A. Ghafoori


 On appeal, Garnett asserts that the trial court erred in granting Ghafoori's no-evidence motion for summary judgment because her summary judgment evidence raised
fact issues regarding Graybill's qualifications, the appropriate standard of care for Ghafoori,
and whether Ghafoori breached that standard of care. Conversely, Ghafoori contends that
Graybill, an infectious disease expert, was not qualified to provide expert testimony
pertaining to the standard of care for plastic surgeons. Ghafoori further argues that
Garnett has not produced competent summary judgment evidence establishing (1) an
appropriate standard of care applicable to plastic surgeons, (2) that Ghafoori breached the
standard of care applicable to plastic surgeons, and (3) that Ghafoori's alleged breach of
the standard of care proximately caused the damages sustained.

 In response to Ghafoori's no-evidence motion for summary judgment, Garnett
produced (1) Graybill's expert reports dated February 25, 2004 and July 15, 2005,
accompanied by his curriculum vitae, (2) her third amended original petition filed on April
5, 2005, (3) excerpts of the deposition testimony of Graybill dated October 13, 2005, and
(4) the operative report compiled by Ghafoori on September 6, 2002. Graybill's curriculum
vitae and reports establish that he is a professor in the division of infectious diseases at
The University of Texas Health Science Center at San Antonio. Graybill received his
medical degree from Cornell University in New York in 1966 and was certified by the
American Board of Internal Medicine in 1972. Graybill has written extensively on infectious
diseases and has served as an editor or ad hoc reviewer for numerous infectious diseases
journals and periodicals. It is not clear from Graybill's curriculum vitae as to whether he
was practicing medicine at the time the claim was filed. Graybill's curriculum vitae provides
that his last non-professorial appointment was from 1989 to 1999 as a Chief in the
Infectious Diseases Service at the Audie L. Murphy Memorial Veterans Hospital. It is clear,
based upon Graybill's February 25, 2004 report, that he would be considered an expert in
the field of infectious diseases.

 Garnett, however, uses Graybill's reports and deposition testimony to establish the
standard of care and breach of the standard of care by Ghafoori, a plastic surgeon. 
Graybill provides in his February 25, 2004 report that:

 Once diagnosed, the standard of care for the appropriate
management of the infection, would be antifungal agents, including
amphotericin B or a variety of triazoles. Critically importantly, the prosthetic
breast implants should have been removed and discarded. After an
appropriate period of antifungal therapy, usually many months for this class
of organisms, new implants could be considered . . . . The failure to remove
the old implants on e [sic] the infection was diagnosed was a violation of the
standard of care by Dr. Giovanna Ghafoori. As a result of not removing the
implants in a timely manner, and not providing the appropriate antifungal
therapy, Ms. Garnett was predisposed to continuing infection with Bipolaris. 
Such lack of treatment was a proximate cause of Ms. Garnett's continuing
infection with Bipolaris. 


In further support of Graybill's conclusions, Garnett relies heavily on opinions from the
Fourteenth Court of Appeals in Blan v. Ali, 7 S.W.3d 741, 746-47 (Tex. App.-Houston
[14th Dist.] 1999, no pet.) and the Texas Supreme Court in Broders v. Heise, 924 S.W.2d
148, 152 (Tex. 1996). 

 In Blan, the appeals court held that a neurologist was qualified to testify regarding
the standard of care applicable to any physician who undertakes to treat and care for a
patient suffering from a stroke along with the neurological complications of lupus cerebrids. 
7 S.W.3d at 744-47. "[A] medical witness who is not of the same school of practice may
be qualified to testify if he or she has practical knowledge of what is usually and
customarily done by other practitioners under circumstances similar to those that
confronted the defendant charged with malpractice." Id. at 745. Moreover, "[i]f a subject
of inquiry is substantially developed in more than one field, a qualified expert in any of
those fields may testify." Id. (emphasis in original). 

 In Broders, the Texas Supreme Court held that an emergency room doctor was not
qualified to testify about neurosurgery and the effectiveness of various head injury
treatments. 924 S.W.2d at 153 (applying rule 702 of the Texas Rules of Evidence). (13) The
court further noted that "there is no validity, if there ever was, to the notion that every
licensed medical doctor should be automatically qualified to testify as an expert on every
medical question. Such a rule would ignore the modern realities of medical specialization." 
Id. at 152. The Broders court also noted that only "when a party can show that a subject
is substantially developed in more than one field," can testimony "come from a qualified
expert in any of those fields." Id.

 Here, however, Graybill never states that the area of infectious diseases is
substantially developed in the field of plastic and reconstructive surgery. Graybill notes in
his July 15, 2005 report that "I am not a surgeon and do not deal with complications of
breast prosthesis very much." (14) Furthermore, in his deposition, Graybill makes the
following admissions:

 Q: You understand, Dr. Ghafoori is a surgeon, plastic surgeon?

 

 A: I do.


 Q: Who did the plastic surgery, breast reconstruction in this case?


 A: Yes.


 Q: Let me start kind of globally and then see where I need to go in more
detail. Are you appearing in this case as an expert in the surgery,
plastic surgery specifically?


 A: By no means.


 Q: Standard of care for breast reconstruction?


 A: Not at all.


 Q: In other words, you're not appearing in this case representing to the
Court that you're an expert in the standard of care for plastic surgeons
in breast reconstruction?


 A: I do not do surgery.


 . . . .


 Q: Is it therefore correct that you would not--you agree you would not be
giving opinions in this case as far as plastic surgery standard of care
violations for Dr. Ghafoori?


 A: That is true. 

Moreover, in his deposition, Graybill does not comment on the interrelatedness of the
medical fields of infectious diseases and plastic surgery. This Court will not automatically
assume, without any evidence indicating otherwise, that two medical fields are so
interrelated that a qualified expert in any of those fields may testify. See Olveda, 141
S.W.3d at 682-83; see also Garcia v. Rodriguez, No. 13-05-00747-CV, 2007 Tex. App.
LEXIS 7193, at *14 (Tex. App.-Corpus Christi Aug. 30, 2007, pet. denied) (mem. op.). We
therefore conclude that Garnett's summary judgment evidence fails to demonstrate that
Graybill was qualified to opine on the standard of care, breach, and causation pertaining
to Ghafoori. Accordingly, we overrule Garnett's first issue.

B. Motiwala


 On appeal, Garnett further asserts that the trial court erred in granting Motiwala's
no-evidence motion for summary judgment because her summary judgment evidence
raises fact issues on: (1) the appropriate standard of care for Motiwala; (2) Motiwala's
alleged breach of the standard of care; and (3) that Motiwala's alleged breach proximately
caused the damages Garnett sustained. Conversely, Motiwala claims that Garnett has
failed to produce evidence establishing Motiwala's negligence entitling her to judgment as
a matter of law. 


 1. Applicable Law


 The elements that must be proven for a medical malpractice action are: (1) a
physician's duty to act according to a certain standard; (2) a breach of the applicable
standard of care; (3) an injury; and (4) a causal connection between the breach of care and
the injury. Smith v. Mossbacker, 94 S.W.3d 292, 294 (Tex. App.-Corpus Christi 2002, no
pet.); Krishnan v. Ramirez, 42 S.W.3d 205, 212 (Tex. App.-Corpus Christi 2001, pet.
denied); Schorlemer v. Reyes, 974 S.W.2d 141, 147 (Tex. App.-San Antonio 1998, pet.
denied).

 The threshold question in a medical malpractice case is the standard of care. Jones
v. Miller, 966 S.W.2d 851, 854 (Tex. App.-Houston [1st Dist.] 1998, no pet.). The
applicable standard must be established so the fact finder can decide if the defendant
deviated from it. Id. To raise a fact issue sufficient to defeat summary judgment, the
plaintiff's controverting expert should specifically identify the standard of care, establish the
expert's familiarity with that standard, and explain why the treatment rendered by the
defendant health-care provider breached the applicable standard. Hightower v. Saxton,
54 S.W.3d 380, 389 (Tex. App.-Waco 2001, no pet.); Keeton v. Carrasco, 53 S.W.3d 13,
25 (Tex. App.-San Antonio 2001, pet. denied).

 In order to be a proximate cause, the negligence must have been a substantial
factor in bringing about the harm and without which, the harm would not have occurred.
Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush, 122 S.W.3d 835, 852 (Tex.
App.-Fort Worth 2003, pet. denied); Sisters of St. Joseph of Tex., Inc. v. Cheek, 61
S.W.3d 32, 35 (Tex. App.-Amarillo 2001, pet. denied). To establish proximate cause, a
plaintiff must prove both cause-in-fact and foreseeability. Duff v. Yelin, 751 S.W.2d 175,
176 (Tex. 1988). Cause-in-fact requires a causal connection between the injuries suffered
and the negligence of appellants based upon "reasonable medical probability," not mere
conjecture, speculation, or possibility. See Park Place Hosp. v. Estate of Milo, 909 S.W.2d
508, 511 (Tex. 1995). For an injury to be foreseeable, "a person of ordinary intelligence
should have anticipated the danger created by a negligent act or omission." Doe v. Boys
Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995).

 2. Discussion


 In response to Motiwala's no-evidence motion for summary judgment, Garnett
produced (1) Graybill's expert reports dated February 25, 2004, and July 15, 2005,
accompanied by his curriculum vitae, (2) her third amended original petition filed on April
5, 2005, (3) excerpts of the deposition testimony of Graybill dated October 13, 2005, and
(4) the operative report compiled by Ghafoori on September 6, 2002. With respect to
Graybill's expert reports, only his July 15, 2005 report makes reference to Motiwala. As
such, we will focus on the July 15, 2005 report of Graybill, as it pertains to Motiwala.

 On appeal, Motiwala contends that the July 15, 2005 report itself does not establish
that Graybill is qualified to opine on the standard of care, breach, and causation of an
infectious disease specialist. However, we have already concluded that Graybill is qualified
to opine on such matters. Therefore, we will analyze Graybill's July 15, 2005 report as a
part of Garnett's summary judgment evidence.

 In asserting liability against Motiwala, Garnett relies heavily on an alleged
intraoperative telephone conversation between Ghafoori and Motiwala during the breast
reconstruction surgery done on September 6, 2002. In fact, Garnett contends that the
operative report of Ghafoori establishes that Ghafoori consulted with Motiwala during an
intraoperative telephone conversation that pertained to correct medication coverage for a
suspected infection. (15) Garnett further contends that Motiwala, an infectious disease
specialist, failed to recommend, in the alleged intraoperative telephone conversation, that
Ghafoori remove the implants until the suspected infectious condition could be resolved. 
In support of these contentions, Garnett refers to Graybill's deposition testimony where
Graybill noted that "[t]hat struck me as being surprising because this is a prosthetic device
that was put in; and prosthetic devices, when they are infected, usually stay infected until
they are taken out." Graybill further noted "I would have thought that Dr. Motiwala, had he
been contacted during surgery as Dr. Ghafoori had noted, would have suggested that she
leave the prosthesis out until this infection had completely healed." In his July 15, 2005
report, Graybill further notes:

 In his plan of management, Dr. Motiwala agreed with extensive
surgical debreidement and "exchanging the implant" and beginning the
patient on IV itraconazole, to be changed later to an oral formulation, and
continued 3-6 months. It is unclear to me why Dr. Motiwala would concur
with "echanging [sic] the implant," at the time of active infection, because this
would make it much more difficult to treat the patient successfully with a
foreign body, either the same one or a new one, in place. 


 . . . .

 

 Regarding the deposition of Dr. Motiwala, there are a few key issues:

 

 1) page 40, line 11. A difference of recollection as to whether Dr. Motiwala
was called during surgery--and agreed with the reimplantation of the
prosthesis into the right breast then, or whether he saw her ex post facto at
his office. This is important, as sight unseen, it might have been very difficult
for him to argue with Dr. Ghaffori [sic] to take out the implant. Lines 14 and
15, reuse of the prosthetic device is very surprising, at the least. 

 

 2) p43, lines 9-24. This is key. If Dr. Motiwala had seen the patient he might
have asked for the prosthesis to be removed.

 

 3) Page 46. Dr. Motiwala's comments on joint prostheses are appropriate.

 

 4) page 50. Although Dr. Motiwala noted the patient appeared well, she still
had a drain in place, potential source for more cultures and appropriate
stains for Bipolaris. . . . If Dr. Motiwala was convinced enough of a problem
to give her 6 months of itraconazole, he might have suggested that Dr.
Ghafoori remove the implant.


Based on the foregoing summary judgment evidence, Garnett asserts that material fact
issues remain as to the essential elements of the medical malpractice claim against
Motiwala, thus precluding the trial court's granting of Motiwala's no-evidence motion for
summary judgment.

 On the other hand, Motiwala, in his no-evidence motion for summary judgment,
highlights Ghafoori's deposition testimony, taken on June 30, 2005, where the following
exchange took place:

 Q: All right. And then was it at that time that you called Dr. Motiwala?

 

 A: Yeah. At the time of--at the time--I can't tell you where I was, where
was I standing at the time that I called him. Is that your question?

 

 Q: But it was mid-surgery?

 

 A: No.

 

 Q: And I'm referring to your note. It says--on page 4 of that,
"Intraoperative consultation was made with Dr. Motiwala to provide
appropriate adequate coverage."

 

 A: . . . When I say "interoperative consultation," I mean--really, what
occurred and what I mean is, you know, I have that--I have the
patient there. I'm not actually operating on her at the time I'm calling
him. I mean, this is--I'm in there, I'm writing my notes. We've paged
him. You know, I'm in there, I see fluid, I know she is going to need
antibiotics until we find out what's going on. Put in a call in to Dr.
Motiwala. Dr. Motiwala calls back--

 

 Q: So was this actually before the surgery?

 

 A: No, no, no, no. Once I see the fluid, and in my differential is possible
infection, we have got a possible chronic or subacute infection, and
I want to make sure, number one, that this patient secures followup
[sic], okay, because if this is an infection, and if she elects to continue
to try to salvage the implant--again, I don't know what her answer is
going to be. I made--I had to kind of make a decision for her
interoperatively. 

 

 . . . .

 

 Q: Okay. Well, were you able to consult with him on the decision of
whether or not to--to leave the implants in or to replace the implants?

 

 A: That wouldn't even have been a consideration. That's a surgical
decision to make. But, no, the surgery had been done at that point.

 

 Q: You didn't view that as a--an infectious disease question as to
whether or not--

 

 A: One, I don't have a known diagnosis of infection. Two, it's definitely,
at least, clinically--other than fluid, she had no symptoms. It
was--you know, clinically, it was innocuous at this point. All I had was
a finding of fluid.

 Motiwala further highlights his own deposition testimony, taken on June 23, 2005,
where the following exchange occurred:

 Q: Did you then, in your view of the matter, reform a relationship when
Dr. Ghafoori called you for a consultation in 2002?

 

 A: In 2002, when she called me to see this patient, to be honest with
you, I did not remember the patient by name.

 

 Q: Okay.

 

 A: I just accepted it.

 

 Q: And so basically she called you during surgery; is that right?

 

 A: No. What she called me for was to notify me that she would like me
to see the patient and to follow [sic] in my office as an outpatient. 
That's the only conversation we had.

 

 Q: What was that date?

 

 A: September the 6th of 2002.

 

 Q: Okay. Well, I guess what I want to ask you about is, she did not
intraoperatively, according to your recollection, call you and ask you
what to do while she was in surgery?

 

 A: Absolutely not.

 

 Q: And I haven't taken Dr. Ghafoori's deposition yet, you understand, but
my understanding from the records is that it will be her position that
she needed your advice during surgery and she called you to find out
what--the appropriate thing to do as far as reusing an implant.

 

 A: No. Only--my recollection is, the only thing that she notified me was
that--"Dr. Motiwala," you know, "I have this patient that I have
operated on, and I'd like you to see her in your office as an
outpatient." I said, "That's fine; send her in."

 

 Q: And your understanding was that that was after surgery that she--

 

 A: Probably yes. Yes, that's my understanding, that it was after she
finished. She notified me of the consultation that I would be seeing
in my office. 

 We conclude that Garnett has failed to establish the essential elements of her claim
by more than a scintilla of evidence. See Hightower, 54 S.W.3d at 389; Keeton, 53
S.W.3d at 25. Neither Graybill's July 15, 2005 report nor his oral deposition clearly
establish the standard of care Motiwala owed to Garnett, much less breach or proximate
causation. Essentially, Graybill's entire expert opinion as to Motiwala's liability hinges on
the alleged intraoperative telephone conversation between Ghafoori and Motiwala. (16) 
However, the deposition testimony of Ghafoori and Motiwala establishes that the telephone
conversation took place after the surgery was completed not during surgery as alleged and
solely involved follow-up care for Garnett to treat any suspected infections. Furthermore,
Garnett has failed to provide competent summary judgment evidence establishing that
Motiwala failed to recommend to Ghafoori that she remove and replace the implants after
it was suspected that they were infected during the surgery and that such a failure was a
proximate cause of Garnett's damages. Graybill, in his deposition testimony, also opines
that Motiwala was reasonable in his follow-up treatment of Garnett. (17) The record does not
contain additional summary judgment evidence provided by Garnett as to Motiwala. 
Therefore, after indulging every reasonable inference and resolving any doubts in Garnett's
favor, without disregarding evidence supporting the motion, we conclude that Garnett did
not raise a material fact issue as to the essential elements of her medical malpractice claim
against Motiwala. See Hightower, 54 S.W.3d at 389; Keeton, 53 S.W.3d at 25. We further
conclude that the trial court did not err in granting Motiwala's no-evidence motion for
summary judgment. Accordingly, we overrule Garnett's third issue. 

IV. Conclusion

 Having overruled all of Garnett's issues on appeal, we affirm the judgment of the
trial court. 
 
 __________________________ 

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 28th day of February, 2008.


 
1. In her original notice of appeal and in her second amended notice of appeal, which is now contained
in the record, Garnett states that: 


 Now comes CATHRYN LISA GARNETT, Plaintiff in the above styled and numbered cause,
and gives this written notice of appeal to the Court of Appeals of the State of Texas from the
judgment herein rendered against CATHRYN LISA GARNETT by Summary Judgment on
behalf of GIOVANNA GHAFOORI, M.D. AND MUHAMMAD MOTIWALA, M.D.


(Emphasis added.) It is clear from the language contained in the notices of appeal filed by Garnett that we
need only focus on the no-evidence summary judgment motions filed by Ghafoori and Motiwala, as the
remainder of Garnett's complaints were not perfected on appeal. See Parrish v. Rutherford, 159 S.W.3d 114,
117 (Tex. App.-Corpus Christi 2004, no pet.) ("Further, appellant's notice of appeal failed to specify they were
appealing the October 3, 2001 order . . . .") (citing Tex. R. App. P. 25.1; 33.1).
2. Former article 4590i is commonly referred to as the Texas Medical Liability and Insurance
Improvement Act ("MLIIA"). See Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039
(former Tex. Rev. Civ. Stat. art. 4590i), repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09,
2003 Tex. Gen. Laws 847, 884. "Article 4590i has been replaced by House Bill 4 (now Chapter 74 of the
Texas Civil Practice and Remedies Code), which governs health care liability claims commenced on or after
September 1, 2003." Olveda v. Sepulveda, 189 S.W.3d 740, 741 n.1 (Tex. 2006) (O'Neill, J., dissenting). 
3. Other physicians performed the cosmetic breast augmentation with implant placement and the
subsequent mastectomy in 1996 and 1999, respectively. These physicians are not parties to this appeal.
4. Garnett further alleges that she had several problems with her breasts due to infection and possible
leakage prior to the September 6, 2002 breast reconstruction surgery. It is because of these problems that
Garnett decided to undergo the second breast reconstruction surgery.
5. Betadine is "used for a preparation of povidone-iodine." Merriam-Webster: Medline Plus Online
Medical Dictionary, available at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=

betadine (last visited Jan. 22, 2008). Povidone-iodine is "a solution of polyvinylpyrrolidone and iodine used
as an antibacterial agent in topical application (as in preoperative prepping or a surgical scrub)." Merriam-Webster: Medline Plus Online Medical Dictionary, available at
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=povidone-iodine (last visited Jan.
22, 2008). However, Ghafoori, in her deposition, claimed that she soaked the implants in Bacitracin and that
she rarely uses Betadine.
6. These allegations are hotly contested. Ghafoori and Motiwala both contend that Garnett's breast
implants were removed and replaced during the September 6, 2002 surgery and that Ghafoori did not make
an intraoperative call to Motiwala during the surgery. Motiwala argues that his involvement in this action
commences when he examined Garnett after the September 6, 2002 surgery for follow-up treatment.
7. Ghafoori notes that at the time of surgery, there was no diagnosis of infection. In fact, Graybill, in
his July 15, 2005 report, admitted that "[o]ne problem, in general is that this uncommon fungus often does not
manifest itself by the usual signs of fever, tenderness, foul smelling pus, high white blood count, etc. That
clearly made it difficult for Dr. Ghafoori to decide upon an infection on the spot."
8. In her first and second amended petitions, Garnett alleges that Ghafoori and Motiwala violated the
appropriate standards of care and that these violations proximately caused her injuries and damages.
9. In the order granting Ghafoori's no-evidence motion for summary judgment, the trial court stated that
"IT IS FURTHER ORDERED that all claims against Defendant Giovanna Ghafoori, M.D. are herewith
dismissed with prejudice."
10. In the order granting Motiwala's no-evidence motion for summary judgment, the trial court stated
that "IT IS, THEREFORE, ORDERED that said Defendant Muhammad Motiwala, M.D.'s No-Evidence Motion
for Summary Judgment is GRANTED, and that the Plaintiff's entire cause of action is dismissed with prejudice
against Muhammad Motiwala, M.D. only." At this time, the trial court also granted a motion to dismiss and
a motion for summary judgment filed by Valley Baptist Medical Center
, neither of which are the subject of this
appeal. 
11. Garnett's March 13, 2006 notice of appeal was defective because it did not provide the date of the
judgment or order of which she desired to appeal. See Tex. R. App. P. 25.1(d)(2). As contained in Motiwala's
brief as "Exhibit 2," Garnett apparently filed a first amended notice of appeal with the trial court on August 29,
2006. In her first amended notice of appeal, Garnett stated her desire to appeal the summary judgments
rendered against her on behalf of Ghafoori and Motiwala and for this appeal to be accelerated and restricted. 
In support of these designations, Garnett represented that she did not participate personally or through
counsel in the hearing that resulted in the judgment being appealed and that she had not "filed any timely post-judgment motions, request for findings of fact and conclusions of law, or notice of appeal." See Tex. R. App.
P. 28, 30. However, the record reflects that Garnett did file (1) a previous notice of appeal on March 13, 2006,
and (2) a request for findings of fact and conclusions of law on April 26, 2006. Thus, this appeal is neither
accelerated nor restricted. See Tex. R. App. P. 28, 30.


 On further review, it was discovered that Garnett's August 29, 2006 notice of appeal was also
defective because Garnett indicated that she desired to appeal the trial court's orders signed on "February
15, 2005" when in fact the orders were signed on February 15, 2006. On January 11, 2008, this Court gave
Garnett notice of the defective notice of appeal and ordered her to cure the defect within ten days of receipt
of the notice. See Tex. R. App. P. 2, 25.1(f), 37.1 & 44.3. On January 28, 2008, Garnett filed a second
amended notice of appeal with the proper date of the trial court's orders, February 15, 2006. In her second
amended notice of appeal, Garnett continued to request that the appeal be accelerated and restricted;
however, we have already determined that this appeal is neither accelerated nor restricted.
12. On appeal, Garnett filed her brief with this Court on October 30, 2006. Her brief was devoid of any
citations to the record. Motiwala brought this deficiency to the attention of this Court and asked to substitute
his statement of facts for Garnett's pursuant to Texas Rule of Appellate Procedure 38.1 and asserted that
Garnett had waived all her arguments for failing to include record citations in her appellate brief. See Tex. R.
App. P. 38.1(h). Usually, a brief that does not contain citations to appropriate authorities and to the record for
a given issue waives that issue. See Abdelnour v. Mid Nat'l Holdings, Inc., 190 S.W.3d 237, 241 (Tex.
App.-Houston [1st Dist.] 2006, no pet.); see also San Saba Energy, L.P. v. Crawford, 171 S.W.3d 323, 338
(Tex. App.-Houston [14th Dist.] 2005, no pet.) (stating that despite liberal interpretation of the Texas Rules
of Appellate Procedure, "parties asserting error on appeal still must put forth some specific argument and
analysis showing that the record and the law supports their contentions . . . ."). Garnett, however, filed a first
amended appellate brief on March 19, 2007, which included appropriate citations to the record. As a result,
we conclude that Garnett has not waived her issues on appeal. See Tex. R. App. P. 38.1(h); see also
Abdelnour, 190 S.W.3d at 241; Crawford, 171 S.W.3d at 338.
13. Rule 702 of the Texas Rules of Evidence requires that experts be qualified "by knowledge, skill,
experience, training, or education," and that their testimony "assist the trier of fact." Tex. R. Evid. 702. The
parties do not make an argument pertaining to the admissibility of Graybill's expert reports within the context
of rule 702. However, we are mindful of the requirements of rule 702. Id.
14. Graybill's July 15, 2005 report does address Ghafoori and her treatment of Garnett. Therefore, it
is within the scope of this inquiry.
15. Ghafoori's operative report specifically provides that: "Intraoperative consultation was made with
Dr. Matawalla [sic] to provide appropriate adequate coverage, and he will see her in his office to follow-up." 

16. Graybill even admits the following in his deposition:


 Q: Isn't it fair to say that the evidence in this case establishes that Dr. Ghafoori simply
did not call Dr. Motiwala during the procedure? Isn't that your impression of the
testimony that you just heard?

 

 MR. STAPLETON: I'll object to the form of the question.

 

 A: That is the conclusion that one would reach if one were accepting all the words of
that testimony. And I understand that is was given under oath and all that. I'm clear
on that.

 

 . . . .

 

 Q: So, it is reasonable to conclude then, based on both Dr. Ghafoori's testimony and
Dr. Motiwala's testimony, under oath, that Dr. Ghafoori did not call him during the
procedure, fair?

 

 A: Fair.

 

 Q: So, that being the case, you are not critical of Dr. Motiwala at all because he didn't
get a phone call during the procedure. Isn't that right?

 

 A: Yes.
17. Graybill further mentions in his deposition:


 Q: All right, sir. My question was whether or not Exhibits 2 or 3 state that Dr. Motiwala
was negligent or that he breached the standard of care.

 

 A: I do not believe that Dr. Motiwala in taking his actions in the treatment that he
initiated with the itraconazole--medically chose the wrong agent. I think it was, it
was a suboptimal choice. So, for the selection of itraconazole, I think that one might
have done better.